# Thomas L. Bennett, M.D.
## Forensic Medicine and Pathology

January 21, 2016

Todd Ehrenreich, Attorney at Law
WEINBERG WHEELER HUDGINS GUNN & DIAL
2601 South Bayshore Drive
Suite 1500
Miami FL 33133

RE:  F15-155,   DANIEL McCOOL, as Personal Representative of the Estate of Mary J. McCool, deceased, for the benefit of the decedent's survivors and estate   v  WOODSTREAM CORPORATION, a foreign corporation; HOME DEPOT USA, INC., a foreign corporation; ITW GLOBAL TIRE REPAIR INC. f/k/a Accessories Marketing, Inc., a foreign corporation.

ITW GLOBAL TIRE REPAIR INC. f/k/a Accessories Marketing, Inc., a foreign corporation, Third-Party Plaintiff,  vs. LISS AMERICA LIMITED LIABILITY COMPANY a/k/a Liss America, LLC; a foreign corporation; and LISS KFT, a Hungarian company.

In the United States District Court, Southern District of Florida
Case No.: 9:15-cv-80504 RLR

Dear Mr. Ehrenreich:

Thank you for the opportunity to work with you on the above case.  You asked me to review the materials regarding this event, and to offer what information and opinions I may have from my role as a physician and forensic pathologist.  I am board certified in anatomic pathology, clinical pathology and forensic pathology, and am active as a forensic consultant and forensic pathologist for Wyoming and Montana and adjacent states, working with our courts, families and Coroners in the investigation of the causes, manners and circumstances of injuries, deaths and other medical conditions.  I have performed well-over 11,000 forensic autopsies in my career, the majority involving non-natural deaths.  These have included investigating thousands of injuries, toxicology cases and trauma-associated deaths.  I received the following materials for review:

1. Palm Beach Gardens Police Department reports:
    a. Scene photos, including Mosquito Magnet photos and ED photos;
2. Palm Beach County Fire Rescue records;
3. Palm Beach Gardens Medical Center records;
4. Palm Beach County Medical Examiner's Office report and file:
    a. Autopsy pictures;
5. Medical, Dental and Pharmacy records for Mary Jo McCool;
    a. A & B Family Dentistry;
    b. APS Pharmacy;
    c. CVS Pharmacy;
    d. Dr. Gabriella Bonomo;
    e. Estetica Institute of the Palm Beaches;

Forensic Medicine and Pathology, PLLC
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447        Fax:
Email:    doctor4n6@gmail.com    Website:    www.forensics-tlb.com

   f. Express scripts;
   g. Heather Carr, ARNP;
   h. Jupiter Interventional Pain Management;
   i. Jupiter Medical Center;
   j. Aldo Lombardo, MD, Plastic Surgery;
   k. MedExpress – Dr. Dan Corpus and Sophia Salmon;
   l. Nationwide Insurance;
   m. OB-Gyn Specialists – Kelly McCall;
   n. Palm Beach County Fire Rescue;
   o. Publix Pharmacy;
   p. Target Pharmacy;
   q. Total Age Rejuvenation;
   r. Unum Life Insurance Company;
   s. Walgreens;
   t. Wal-Mart Pharmacy;
   u. Water's Edge Dermatology;
6. Palm Beach Gardens Ambulance records, Palm Beach Gardens Medical Center records and additional records for Detective Broehm on day of incident;
7. SGS Certificate of Analysis;
8. Boston Chemical Environmental Analysis report and Preliminary report;
   a. Excel spreadsheet of various gases and measurements;
9. Plaintiff Expert disclosures:
   a. William R. Sawyer, PhD, Toxicologist;
   b. Marco Kaltofen, MS, PE, NSE, Boston Chemical Data Corp.;
   c. Dr. Marthinus van Schoor;
   d. Vincent J.M. DiMaio, MD;
   e. Roderick C. Moe, CPA;
10. Depositions for the following:
   a. Det. Bryan Broehm, 8-31-15;
   b. Kimberly Cesark, 10-27-15;
   c. Robert Cruz, 11-17-15;
   d. Rick Eyer, 11-17-15;
   e. Marko Lubic, 11-16-15;
   f. Gary Roulston, 11-16-15.

**SUMMARY:**     Mary Jo McCool, 44 years of age at the time of her death (dob 10-17-68, dod 10-12-13) was found by her 20 year-old son floating face down in the pool at their West Palm Beach home (5126 Isabella Drive) in the early afternoon of Saturday, 10-12-13.  She was reportedly last known alive around 0953 that day, when she returned to their gated community, and was reportedly setting up for a birthday party around their pool.  Per the police report, "Connor advised that when he first saw his mother in the pool, abnormally with her athletic clothes and shoes on, he observed what he described as her unusual positioning. He reported that her upper body was lying on the surface of the water and her legs were dangling below her almost as if she were standing in the pool yet hunched over with her face in the water."  Connor reported he started CPR on his mother.

Fire Rescue was notified at 1257, arriving at the scene at 1301 and reaching Ms. McCool at 1303.  She was unconscious with no pulses or respirations, GCS = 3.  They departed for Palm Beach Gardens Medical at 1317, performing CPR and arriving at 1326, noting her condition was unchanged.  She was pronounced dead at 1335.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com     Website:   www.forensics-tlb.com

**POLICE REPORT:   Per their report (p. 8-9 of Police report):**   "On Saturday, October 12th, 2013, at 5:13 p.m., I responded to 5126 Isabella Drive, Palm Beach Gardens, Florida, in reference to the death investigation of Mary Jo McCool. At the time of my arrival, the lead detective on the case, Detective B. Broehm, I.D. 302, was located at the Gardens Medical Center with Mary Jo.  Upon arrival, I met with Officers G. Soule, I.D. 356 and P. Adorno, I.D. 420, who were the first officers on scene, and subsequently the ones who maintained the crime scene log. Officer Soule briefed me on the situation / incident. Shortly after my arrival, Detective Broehm arrived with the McCool`s oldest son, Connor McCool. Connor gave consent to search the home both verbally and signed a consent to search form. Detective Broehm assisted me with the crime scene portion of the investigation. A thorough search of the home (both inside and outside) was conducted, and everything appeared to be in order.  In the kitchen, on the kitchen counter, there were several items pertaining to the "Mosquito Magnet", a bug killing system that operates on propane, to include instructional manuals, opened boxes with cartridges of biting insect attractants "Octenol" and "Lurex3", boxes of "CO2" cartridges, and several extra valves, pins, and plugs. There was also a receipt from Home Depot, dated 10-12-13, that listed three items being purchased at 9:16 a.m. - 3 pack of CO2, 16 oz Cutter backyard bug fogger, and 1 gallon of tiki torch fuel. From the kitchen garbage can, I recovered an empty plastic bag that once contained an Octenol cartridge. Detective Broehm advised me that per the family, Mary Jo was preparing for a social / family gathering at the house later that night. With the items found on the kitchen countertop, coupled with the Home Depot purchase, it appeared Mary Jo had been working in the backyard to get it ready for the party; setting up the Mosquito Magnet system by replacing the cartridges and CO2, and planting tiki torches in planters and placing them around the pool.  Detective Broehm attempted to conduct a closer examination of the Mosquito Magnet, which was located in the backyard, on the south side of the yard along the fence line, close to the covered portion of the patio. He immediately became violently ill; he suffered loss of breath, nausea, and vomiting. He immediately ran to the opposite end of the patio, away from the system upon getting sick.  Palm Beach Gardens Fire Rescue 65 was called to the scene to treat Detective Broehm (P.B.G.F.R. run number 94175).  While in the ambulance, Detective Broehm`s CO2 level was tested and measured a carbon dioxide level of "7" (reportedly at 1921 on the Rad 57).  Palm Beach Gardens Paramedic Winkelman, who was also present during the transport of Mary Jo earlier that day, advised me that her carbon dioxide level had measured "54" at that time. Paramedic Winkelman advised a normal healthy person should not have a reading. Due to this information, I made telephone contact with the Palm Beach County Medical Examiner`s office, and spoke to Investigator Heron Ruiz. He requested the Mosquito Magnet system and all items pertaining to it (cartridges, instructions, etc.) be collected as evidence for further investigation. For officer safety reasons, Palm Beach Gardens Fire Rescue disconnected the Mosquito Magnet system (the unit, stand, and propane tank) and placed it into a 35 gallon drum. Palm Beach Gardens Fire Rescue then transported the system back to the Palm Beach Gardens Police Department. Sergeant G. Fleming, I.D. 183, followed Palm Beach Gardens Fire Rescue from the scene to the Police Department. Under Sgt. Fleming`s direction, Palm Beach Gardens Fire Rescue placed the system/drum in the police department's gated parking lot, in a covered area located next to an outside evidence locker."

Multiple police officers responded to the scene and to the ER.  They note, "While in the Emergency Room, I was approached by attending physician, Scott McFarland, MD, who commented that Mrs. McCool`s death, presumed to be by apparent drowning, seemed unusual to him and insinuated that the matter necessitated further evaluation. Dr. McFarland referred me to Dr. Wolford for additional information. Upon inquiring with Dr. Wolford regarding Dr. McFarland`s comment, he informed me, "unofficially", that during his examination of Mrs. McCool while CPR was being administered, he had listened to her lungs using a stethoscope. While doing so, he advised that he did not detect the usually heard sounds from the lungs of drowning victims, and it did not sound as if her lungs contained much fluid or an amount that would be consistent with an absolute conclusion of accidental drowning as the manner and cause of death. Those observed conditions, along with the factor that she was found in the

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com     Website:   www.forensics-tlb.com

pool clothed in a t-shirt, athletic shorts, and athletic shoes with sox, seemed to indicate that perhaps other circumstances may have precipitated her ending up in the pool in a state of cardiac arrest. I then visually examined Mrs. McCool and took photographs of her. As noted by Dr. Wolford, I observed that she was wearing the described clothing, except for the shirt which had been cut off by responding emergency personnel while attempting to resuscitate her. I could not observe any evidence of physical trauma or serious injury. Several discolored marks could be observed on the surface of her skin on her chest and arms, which appeared to have been caused by the removal of adhesive devices attached during the medical rescue efforts. A small, superficial abrasion along with several smaller fingertip sized contusions surrounding it, were observable on the inside of her right bicep which appeared as if they were perhaps sustained when Mrs. McCool was being rescued from the pool and being pulled onto the adjacent pool deck. Other than those described, I did not observe any evidence of physical injury or trauma that may indicate that Mrs. McCool had struggled with any other person or that any visible injury had been inflicted upon her, or was otherwise sustained, that may have been reasonably considered to have caused her to involuntarily end up in the pool, or lose consciousness."

They found in the kitchen of the home a 10-12-13 receipt from Home Depot for the Mosquito Magnet and other items, the receipt time given as 0916. All events with the Mosquito Magnet device appeared to have otherwise occurred outdoors in the open air. Their report notes, "Detective Broehm attempted to conduct a closer examination of the Mosquito Magnet, which was located in the backyard, on the south side of the yard along the fence line, close to the covered portion of the patio. He immediately became violently ill; he suffered loss of breath, nausea, and vomiting. He immediately ran to the opposite end of the patio, away from the system upon getting sick. Palm Beach Gardens Fire Rescue 65 was called to the scene to treat Detective Broehm (P.B.G.F.R. run number 94175). While in the ambulance, Detective Broehm`s CO2 level was tested and measured a carbon dioxide level of "7". Palm Beach Gardens Paramedic Winkelman, who was also present during the transport of Mary Jo earlier that day, advised me that her carbon dioxide level had measured "54" at that time. Paramedic Winkelman advised a normal healthy person should not have a reading. Due to this information, I made telephone contact with the Palm Beach County Medical Examiner`s office, and spoke to Investigator Heron Ruiz. He requested the Mosquito Magnet system and all items pertaining to it (cartridges, instructions, etc.) be collected as evidence for further investigation. For officer safety reasons, Palm Beach Gardens Fire Rescue disconnected the Mosquito Magnet system (the unit, stand, and propane tank) and placed it into a 35 gallon drum. Palm Beach Gardens Fire Rescue then transported the system back to the Palm Beach Gardens Police Department." (p. 16). On page 19 of the police report, they claim the Mosquito Magnet device was taken to the Palm Beach County Medical Examiner`s Office for examination.

Per the report of **Det. B.C. Broehm**, as he was inspecting the scene, "When I climbed out from under the hedge and then stood up, I immediately felt light headed and dizzy. The effect was pronounced sufficiently to make me feel a bit imbalanced, so I moved away from the pool. I had even commented to Detective Cesark and Officer Soule that I had felt dizzy and had better move away from the pool, before I fell in too. I walked away from the pool and stood by the patio doors toward the center of the home, until I felt better." On pages 17-8, "Officer Soule and I went back outside and located the Mosquito Magnet device along the fence line on the south side of the property. It was positioned between the fence and some decorative landscaping, below several palm trees. That location was four to five feet from the southeast corner of the covered patio located at the west end of the pool and patio area. That covered patio section was enclosed on the west side by a wall, and on the north side by the home. The closest entrance to the pool was approximately twelve feet from where the Mosquito Magnet device was located. When I observed the Mosquito Magnet device, I detected a small green L.E.D. light shining from it. Although I had previously heard of such devices, I had never seen one before. I kneeled down on one knee, approximately two to three feet away from the device as I made my initial visual assessment of the device, and listened to hear any operating sounds. I could hear a humming or buzzing sound emitting from the device and it seemed to be running. As I was kneeling there, I began to again feel lightheaded

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447           Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com

and dizzy, even more so than I had earlier when I was crawling on the ground to reach the golf ball and soft ball under the hedges. I stood up and leaned against the fence to maintain my balance. I commented to Officer Soule that I felt dizzy again, and that I wondered if the device could have been dispensing something, perhaps the R-Octenol, that was causing me to experience those effects and might also have had something to do with what happened to Mrs. McCool. The device was located approximately thirty five feet from where I had first become dizzy after lying on the ground at the foot of the hedges while looking at the soft ball.  Officer Soule is approximately four inches taller than I am and was standing closer to the covered portion of the patio, about six to eight feet away from and slightly above me on the paved patio, as opposed to my kneeling position on the ground. I asked him if he felt any unusual effects from being nearby to the device. He advised that he didn`t seem to be experiencing any unusual symptoms. He then handed me his flashlight and recommended I examine the device more closely.  I then got down on my hands and knees and began crawling around the Mosquito Magnet device, using the flashlight to inspect it to see if I could find any blatant signs of malfunction or visual evidence of any type of emissions from it.  As I squeezed between the device and the fence, attempting to view the bottom of the device and the end of the device positioned away from me, my face came within a few inches of the device. Once my face came within that close proximity to the device, I inhaled one hot breath of something being emitted from it, and I became instantaneously suffocated.  It felt as if my throat was being choked and I could not breathe. I began to panic as I got up and tried to get away from the device as quickly as I could. My instinct was to try to get inside the house to "fresh air." As I was stumbling toward the glass doors to the house, I was choking and gagging, trying to breathe. It seemed as if the harder I tried to gasp for air, the more I was unable to catch my breath. I became nauseas and began to regurgitate as I was struggling to breathe. I didn`t want to go inside the residence and throw up, and also did not want to throw up on the patio, contaminating the crime scene, so I regurgitated into my mouth. After recovering from that, and standing outside the glass door entry, I began to regain my breath, but, felt as if I might pass out. I quickly went inside and sat down immediately on the couch.  As I sat there trying to recover and trying to mentally focus on fighting the nausea and dizziness, I slowly regained normal breathing. Detective Cesark brought me a glass of water to drink and, other than feeling slightly "impaired," after a few minutes I seemed to be returning to normal.  Out of concern for my well-being, in reflection upon what had happened to Mrs. McCool, Officer Soule determined it was in my best interest to have Fire Rescue respond and evaluate me as a precautionary measure. I remained seated on the couch until their arrival, and began to feel better. Upon their arrival, and my getting up from the couch to walk outside to meet them, however, I began to again become very dizzy and nauseas again.  Once inside the Rescue Ambulance, I was initially administered a light dosage of oxygen through a device placed on my face with two small tubes inserted into my nose. As I breathed that in I continued to improve and feel better. While the paramedics were running diagnostic tests on me, they advised that they were alerted by my carbon monoxide level being measured with the Rad 57 device being used as a `7` at that time. It was explained that as a non-smoking, healthy individual, my carbon monoxide level reading should have been at `0.` I was advised that if the reading had been a minimum of '8`, then their protocols dictated that I would be taken as a trauma alert to St. Mary`s Hospital and placed into a hyperbaric chamber, and then held at least overnight for observation. While all of this was going on inside the Rescue Ambulance, my condition was being discussed outside amongst the paramedics. Detective Cesark was standing nearby and was commented to by PBGFR Paramedic Winkelman that he had responded to the residence earlier that day for Mrs. McCool. Apparently, Paramedic Winkelman related my carbon monoxide reading of `7` as somehow correlating to Mrs. McCool`s carbon dioxide reading from the capnometry measurement during intubation. He mentioned that as they were attempting to resuscitate her, Mrs. McCool`s carbon dioxide level measured at "54" (subsequently obtained PBCFR reports documented Mrs. McCool`s EtCO2 at 50 mmHG). A person in cardiac arrest, or deceased, should not have a carbon dioxide reading anywhere nearly that high; since, without respiration carbon dioxide should be nearly non-existent. A normal carbon dioxide level is in the 35-45 mmHg range for EtCO2, or approximately 6%. My carbon dioxide reading (EtCO2) was measured at `30-32 mmHg.`  Since some time had already elapsed between my exposure

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447         Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com

and the time of Fire Rescues` arrival, and then some further time since I had been administered the low dose oxygen, there was speculation that my carbon monoxide level immediately after exposure would have been at least, if not in excess of, a level `8.` They then placed a larger oxygen mask onto me, covering my face and mouth, which then force-fed higher amounts of oxygen to me. As a result, my carbon monoxide level began dropping and upon it reaching `4` they assessed that transport to Gardens Medical Center Emergency Room for additional tests and observation would suffice, and the trauma protocol was not necessary. I was taken to Gardens Medical Center Emergency Room and, following further tests and evaluations, I was released several hours later."

Detective Broehm further concluded (p. 24). "While being treated by responding paramedics for my exposure to the Mosquito Magnet device, my carbon monoxide level was deemed to be at an elevated level that bordered on being critical and necessitating a trauma protocol response for treatment. Mrs. McCool`s carbon dioxide level was reported as abnormally high for her condition upon initial treatment by responding paramedics. Research shows that copious levels of carbon monoxide or exogenous carbon dioxide have the ability to immediately suffocate a person and render them unconscious. Furthermore, although reports claim that the biting insect attractant being used in the McCool`s Mosquito Magnet device, R-Octenol, is not hazardous to humans, the manufacturer`s own included documentation indicates the potential otherwise, cautioning against potential respiratory arrest upon inhalation and recommends the immediate summoning of emergency medical response and the administering of CPR. Based upon my response to exposure to the Mosquito Magnet device and the known potential effects upon humans that exposure to high levels of the by-products of its operation can cause, a plausible theory of what caused Mrs. McCool to become unconscious and end up in her pool where she ultimately drowned can be reasonably proposed that she inhaled an excessive amount of one of, or a combination of, those by-products. That exposure caused her to experience instantaneous suffocation, as I did, and in her panic to retreat from the device she fled in the direction of the pool where she experienced her loss of consciousness and then fell into the pool. In the absence of any other evidence to account for what happened to Mrs. McCool and provide a conclusive determination for her Manner of Death, I can only present the above described explanation as a hypothetical theory. Until further examination and a thorough diagnostic test of the device occur through the civil litigation process and those results are provided, my theory cannot be deemed certifiably accurate. Therefore, the results of my investigation are in concurrence with the declared Cause of Death as drowning, with an undetermined Manner of Death, as documented by the Palm Beach County Medical Examiner`s Office. Upon my conclusion of the investigation and this final documentation of this matter, I am recommending that the case be closed.

**MEDICAL:**   Ms. McCool was 65 inches and 166 pounds. She was reportedly a non-smoker and occasional drinker of alcoholic beverages. The decedent's son, Connor reported she was a strong swimmer with no medical problems other than some recent complaints of some back pains (police report). The decedent's husband also noted that she took a mild antidepressant. The PBGMC-ED physician wrote (pp. 34, 70, 84). "1532 - I discussed with the police officer my concerns that the patient may not have drowned as the preliminary cause of death as her airway seemed too clear of fluid on examination at her arrival."

Heather Carr, ARNP, had records noting treatment with Ambien and Wellbutrin, as well as Trazodone and other drugs, plus complaints of sleeping problems, anxiety and depression, noting crying spells and sleeping problems. She would take Wellbutrin in the morning, and Ambien to sleep. She noted no history of seizures, but did note drinking 2-3 drinks 5 times per week.

Her medications from APS Pharmacy include thyroid replacement hormone, Phentermine and Hydrocortisone. CVS Pharmacy included her prescriptions for Phentermine, Ambien, Zolpidem, Roxicet,

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com     Website:   www.forensics-tlb.com

Cyclobenzaprine, Cephalexin, Azithromycin, Bactrim (Sulfamethoxazole-TMP), Amoxicillin, Lexapro and Efudex.

Total Age Rejuvenation records included many lab tests and monitoring for "adrenal fatigue", her increased weight complaints, etc.  Dr. Gabriella Bonomo followed her for the weight gain complaints.

She underwent a transobturator (pelvic) sling surgical procedure at All Women Urology on 12-21-11, without apparent complication.  She had noted several months of leakage with exercise and straining.

The medical records with Gabriella Bonomo, MD include a note on 11-18-11 that Ms. McCool had gained 30 pounds over the past year, she then 65 inches and 161 pounds.  She had "ablation for heavy bleeding and vein surgery" in her past, as well as pregnancy-related deep venous thrombosis and phlebitis.  No respiratory problems were noted, and she repeatedly noted no allergies.

Ms. McCool underwent a full abdominoplasty and liposuction hip rolls with ventral hernia repair on 2-8-13, at the Estetica Institute of the Palm Beaches.  She was 65 inches and 156 pounds at that time.

**AUTOPSY:**  The external examination portion of the autopsy was performed starting at 1155 on 10-13-13, the internal examination performed starting at 1140 on 10-15-13.  Michael D. Bell, the District ME, ruled the cause of death as "Drowning", listing only pulmonary edema and scalp contusions (vertex, mid-frontal and right frontal) as autopsy findings.  Conjunctival petechiae were noted in writing on the body diagram.  100 cc brown liquid was in the stomach, with no froth described in the airways, although there was notation of the resuscitative effort findings.  Microscopic features in the lungs included focal orogastric aspiration.

Toxicology findings included no alcohols, but there were Bupropion metabolites and caffeine in the blood.  Immunoassay studies of the blood were otherwise negative for the drugs tested.  Her carboxyhemoglobin level was "nondetected" (p. 12).

The autopsy report noted no injuries to the hands-fingers, but there are photos (#66-8) demonstrating fresh superficial tears to the medial (little finger) side of the left ring finger along the IP joints.

The ME Office had impounded the Mosquito Magnet device from the PBG Police.  They include the history (pp. 15-6) that Det. Broehm gave them, plus rumors of strife in the family, and shady business practices involving the decedent's husband.

**Medical report for Detective Broehm:**  The City of Palm Beach Gardens EMS report notes they delivered Det. Broehm to the Hospital at 2009.  His blood pressure was 146/104, with a pulse of 94.  His throat was red with no swelling noted.  Lung sounds were clear and equal bilaterally.

S-45 YOM C/O nausea and vomiting prior to arrival onscene. Pt stated that he was at the residence performing a death investigation for a previous death of a person at the residence earlier today. He stated that he was overcome by fumes when he was looking around in the bushes. He stated that he found a mosquito machine outside in the residence backyard. He stated that he became very weak, disoriented, dizzy, and felt a burning sensation in his throat, had trouble breathing, and then began to cough forcefully and started to dry heave. Sgt from PBGPD presented Fire Rescue with an insert sheet as to the chemical used in the machine (1-OCTEN-3-OL, 1600 mg Octenol/cartridge). Pt denied CP, LOC, blurred vision, diarrhea, headache, or any other complaints other than the ones stated above.

PMH: none
Medications: none
Allergies: NKDA

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447         Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com

P-For interventions see sequence chart. Pt was transported to PBG Hospital. Hospital was contacted and advised on pts condition, no further orders were given. Poison Control was contacted and they advised that the machine/chemical is non-toxic and to maintain supportive care and transport
to the hospital. Pt was TOT RN at ER with a full verbal report given. Pt read and signed HIPAA Notices of Privacy Practices. Receiving facility signature was obtained.

```
Constitutional: awake, alert, no apparent distress. moist mucus
membranes. Eyes: Pupils equal round and reactive to light,
extra ocular motions intact. Lids and lashes normal. Conjunctiva and
sclera are non-icteric and not injected.. Periorbital areas with no
swelling, redness, or edema. Neck: Trachea midline, no thyromegaly or
masses palpated, and no cervical lymphadenopathy. Supple, full range
of motion without nuchal rigidity. No Meningismus. Respiratory: Lungs
have equal breath sounds bilaterally, clear to auscultation. No
rales, rhonchi or wheezes noted. No increased work of breathing, no
retractions or nasal flaring. Cardiovascular: Regular rate and rhythm
with a normal S1 and S2. No gallops, murmurs, or rubs. No JVD.
Abdomen/GI: Soft, non-tender. No distension. No guarding or rebound.
No evidence of tenderness throughout. Skin: Warm, dry with normal
turgor. Normal color with no rashes, no lesions. MS/ Extremity:
Neurovascular intact. Full, normal range of motion. Neuro: Awake and
alert, oriented to person, place, time, and situation. Cranial nerves
II-XII grossly intact. Motor strength 5/5 in all extremities. Sensory
grossly intact. Psych: Awake, alert, with orientation to person,
place and time. Behavior, mood, and affect are within normal limits.
Head/Face: Normocephalic, atraumatic.
```

**PLAINTIFF DISCLOSURES AND EXPERT REPORTS**;

**William R. Sawyer, PhD**, Toxicologist, authored a report dated 12-16-15. He summarized various depositions, including Paramedic Ryan Winkleman, Lt. Jose Garcia and Det. Brian Broehm, as well as reports from other experts. He opined, "...there is probable cause that the device was capable of releasing emissions consistent with acute induction of restrictive airways and hypoxia." (p. 12 of his report), suggesting that SO2 (sulfur dioxide) may have been the culprit, stating (p. 16 of his report), "...there is evidence from a newly purchased Patriot Mosquito Magnet® that sulfur dioxide can be generated at start-up at levels of 2 PPM (5,244 ug/m3). This level of exposure is consistent with bronchoconstriction among sensitive subjects or asthmatics. Thus, this finding implies that, in an upset condition, the Patriot Mosquito Magnet® is capable of producing toxic gases with dose-dependent variable degrees of bronchoconstriction dependent on the individual's sensitivity to SO2." He further wrote, "While the cause of death is listed as drowning, the manner of death in this case is listed as undetermined on the autopsy report. First and foremost, Dr. Wolford did not detect the sounds usually heard in the lungs of a drowning victim. Additionally, he opined that there was not much fluid in Mrs. McCool's lungs as normally would be consistent with drowning. However, this does not rule out asphyxiation by some other means such as acute exposure to toxic gases. Unfortunately, investigators at the scene did not perform any air monitoring to detect or measure the presence of toxic gases immediately following Mrs. McCool's death. In addition, despite the best efforts of Mr. Alford, a certified Mosquito Magnet® repairman, the Mosquito Magnet® could not be made to function properly, hindering an analysis of the gases Mrs. McCool may have been exposed to at the time of her death. Of significance, Detective Broehm experienced asphyxiating effects while on his hands and feet in very close proximity ("*right up to the thing*") to the Mosquito Magnet® which gives rise to the suspicion of a sulfur dioxide as a probable suspect in Mrs. McCool's death. For example, peer-reviewed studies have documented that significant increases in specific airway resistance may occur in healthy non-asthmatics at exposures of 1 PPM sulfur dioxide. Additional dose-related increases in resistance occur at 3 PPM SO2 with burning of the nose and throat,

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447       Fax:
Email:   doctor4n6@gmail.com       Website:   www.forensics-tlb.com

dyspnea and severe airway obstruction at exposures of 40 ppm.   It is critical to note that an autopsy cannot determine that oxygen was displaced from the breathing zone of a decedent, and toxicological testing will not reveal a direct cause of death by hydrogen sulfide, sulfur dioxide or nitrogen dioxide poisoning as there are no available blood tests for such. Therefore, a cause of death by these gases (asphyxiation/poisoning) can only be determined by an analysis of the circumstances surrounding the death including the scene and equipment suspected of involvement.

Dr. Sawyer summarized his conclusions as:
1. Based upon the analyses conducted to date and facts in the case, there is reasonable probable cause and sufficient evidence for the jury to consider the Mosquito Magnet® as the proximal cause of Mrs. McCool's death through induction of restrictive airways with transient hypoxia and dizziness causing her to fall onto the pool deck and into the pool producing the contusions on her skull.
2. By history, Detective Broehm inhaled an acute respiratory irritant from the device. "*As soon as I got my face right up to the thing, I immediately stopped breathing and I started choking...*"  He began to panic and tried to get away from the device as quickly as possible.
3. Testing of Mrs. McCool's Mosquito Magnet® was complicated with mechanical malfunctions, mud dauber nests and other engineering issues and was deemed by the engineering experts to not be representative of her exposures on the day of her death. It was not possible for the medical examiner to order toxicological analyses of the blood that would have provided meaningful information with respect to combustion gases including sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$) or hydrogen sulfide.
4. The methodology followed by toxicologists and medical examiners in cases where direct toxicological testing is not possible is to rely on the facts and circumstances of the case.  In this case, there is evidence that the Patriot Mosquito Magnet® is capable of releasing sulfur dioxide ($SO_2$) emissions within the range consistent with induction of restrictive airways in sensitive individuals (based on the test results of a properly functioning new Patriot Mosquito Magnet®).
5. It is also known that Mrs. McCool purchased Cutter Backyard Bug Control Outdoor Fogger on the day of her death and had a contract with a landscaping company that maintained her yard and shrubs. MSDSs obtained from the landscaping company revealed that sulfur-containing products were used at some unknown time point on her property and contained 13 to 17% ammonium sulfate or up to 60% metsulfuron methyl (CAS No. 74223-64-6). If the Mosquito Magnet® had been incidentally sprayed with a sulfur-containing product by Mrs. McCool or by the landscaping maintenance personnel prior to the incident, it is my understanding from discussions with the chemical engineering expert in this matter that exogenous contamination of the Magnet with sulfur-containing sprays may have further enhanced the formation of sulfur dioxide.
6. Testing performed by Marco Kaltofen, Ph.D., P.E., documented that the propane used to power Mrs. McCool's Mosquito Magnet® contained 44.7 PPM (by weight) reduced sulfur. Thus, the chemical ingredients (propane, reduced sulfur and oxygen) were present at the time of the incident capable of producing sulfur dioxide ($SO_2$) emissions. Actual testing revealed that the Patriot Mosquito Magnet® is capable of producing toxic gases at levels of at least 2 PPM (5,244 ug/m3) consistent with dose-dependent variable degrees of bronchoconstriction dependent on the individual's sensitivity to $SO_2$. Peer-reviewed studies reveal that higher acute exposure levels among healthy non-asthmatics greater than 1 PPM reveal mild to severe bronchoconstriction over a 1 PPM up to 40 PPM dose range producing severe bronchoconstriction at 40 PPM. Mrs. McCool's Mosquito Magnet® was not fully operational, preventing measurements representative of the time of the incident. However, the surrogate unit tested did reveal SO2 production at start-up. Dr. Kaltofen has explained that the 44.7 PPM (by weight) reduced sulfur within the propane could potentially produce continuous SO2 emissions beyond start-up.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY    82801
Office and cell phone: 406-855-5447            Fax:
Email:   doctor4n6@gmail.com      Website:    www.forensics-tlb.com

7. "To a reasonable toxicological certainty, I have not been able to ascertain any alternative, reasonable cause of Mrs. McCool's death and the concurrent adverse health effects experienced by Detective Broehm."

**Marco Kaltofen, MS**, PE, NSE, Boston Chemical Data Corp., authored a report dated 12-15-15, commenting on testing results and the $SO_2$ produced.  .

**Dr. Marthinus van Schoor** wrote a report dated 12-11-15 in which he criticized the testing performed on the Mosquito magnet and other engineering concerns.

**Vincent J.M. DiMaio, M.D.** authored a report dated 12-16-15, in which he summarized the various police and other reports, etc. and then offered:

> Since the Mosquito Magnet burns gas, it produces carbon monoxide (CO). The amount produced should be minimal. If, however, carbon builds up at the site of the flame then increasing amounts of CO will be generated. As noted, the symptoms of CO intoxication are: weakness, dizziness and nausea. If she had inhaled toxic levels of CO, even in small amounts, the weakness and dizziness may explain her falling into the pool and an inability to get out. Because of cardiac enlargement, Mrs. Mc Cool would have been more susceptible to the effects of CO or any other toxic gases.
>
> Another possibility is sulfur dioxide toxicity. Mrs. McCool had purchased Cutter Backyard Bug Control Outdoor Fogger on the day of her death. In addition, she employed a landscaping company to maintain her backyard. If the Mosquito Magnet had inadvertently been sprayed with a sulfur containing product by ether the landscape company or Mrs. McCool, there may have been enhanced formation of sulfur dioxide.

**Roderick C. Moe, CPA** analyzed the economic issues.


**DEPOSITIONS:**

**Det. Bryan Broehm,** of the Palm Beach Gardens Police Department, was deposed on 8-31-15.
1. After notification at 1345 that day, he first went to the Gardens Medical Center ER, then later to the home/scene. At the hospital, he stated he was approached by a Dr. McFarland, where, "he did it in such a way that he did not want to do it formally. He was walking by me making comments meant -- It seemed that he wanted me to hear what he was saying."... "...saying things of the nature that it was very unusual, very suspicious, you know. He was insinuating that it needed to be looked at more closely than --- Q. Did you inquire as to what he meant at the time? A. I did, and he just -- He commented and said that the fact that the decedent was still wearing clothes and that there was, I guess, some abnormal conditions noted during their efforts to treat her." (pp. 13-5).   Dr. Wolford, her attending physician, then told him, "He wanted it off the record, and he was just generally saying that the sounds they heard, the lung sounds, they didn't seem to be consistent with somebody who had drowned." (p. 17). He said her son, Connor, told him his mom was fully dressed and floating, and "generally, when a person drowns, they don't float. They usually sink." (p. 20, 26). There was a small abrasion on the inside of her arm which Connor told him was made when he pulled her from the pool (p. 25).
2. Ms. McCool and her female friends had planned a party for that day (p. 29).
3. The Detective had eaten at McDonald's that day.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447         Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com

4. Connor and Joanna, his girlfriend, got Ms. McCool out of the pool and did CPR until EMS arrived (p. 34).
5. He left the hospital to go to the home at 1745, where he was met by Det. Cesark. He saw no blood or signs of struggle at the home, except for Connor knocking over a planter to get the stretcher in (p. 56) and no physical trail of how she got in the pool (p. 44). He talked of the torches being partly installed around the pool.
6. He saw a golf ball under the hedge, and gathered it, then "While I laying down there, because I could observe that, you know, about 10 or 15 feet further down the hedge line, there was a softball, you know, the same thing, and so it was: Okay, let me go down and look at the softball, and so I went down again, got down on my belly, climbed under there and looked at the softball, and when I came back up from underneath the hedge line and I went to stand up, I became very dizzy, and I just -- I felt dizzy and imbalanced, and I remember standing up and going whoa …" (p. 48). "Q. Did you feel anything unusual while you were down on the ground? A. You know, like I say -- Again, it was -- No, I don't remember feeling anything in particular unusual. I was down there on the ground. I remember when I came back up, stood up, you know, when I started to rise and --- Q. And what happened when you started to rise? A. Again, I got dizzy and I got a little bit of -- You know, I just felt a little bit unsteady. Q And then what did you do? A Well, at that time, I was like whoa, and I made the comment to the other detective, and I said that I didn't feel well. I said: I'm feeling a little bit dizzy, and so I had better get away from the pool before I fell in, and so I walked away from the area and went up towards the house. Q And when you went towards the house, what did you do then?  A. I remember that I stood there for a few minutes, taking deep breaths, trying to feel normal again.  Q And I'm not sure if this is a good question or how you can explain it, but can you just generally tell us how you felt, like what the feeling was like?  A. Other than saying it was just kind of like dizzy, just basically being dizzy. Dizzy and maybe a little bit of -- A little -- Slightly nauseous a little bit. Q At that point in time, did you have a hard time breathing? A No, I don't recall that, a hard time breathing." (pp. 64-5).
7. By the time he was inspecting the back yard, it was twilight, almost dark (p. 75).  He was directed to the Mosquito Magnet, where "…I had never seen one of these before. What does this do and so on and so forth and so as I was sitting there, I distinctly, even more pronounced than prior to when I was looking for the softball and the golf ball, I saw the -- I really felt dizzy at this time, and I did not feel good, and so I stood up at that the point in time. I remember having to lean up against the fence, and I said that to Jeff, Officer Soule, I said: Man, I really -- I said: I'm telling you right now, I don't feel good. I said: I'm wondering -- I said: Do you feel anything? And he goes -- You know, he's kind of a quirky guy, and he said: I don't know. I hadn't thought about it, he said. And then anyhow, I said: Well, listen -- I said: Well, I definitely -- I said: This isn't just standing up too fast, you know. I said: I don't feel well, and I'm just wondering if this thing is putting off something that caused something. And he's just pretty much matter of fact, and he says: Well, do you want to look at it closer, and so he hands me his flashlight, and like a dummy, you know, I get down, and I take the flashlight, and I get down on all fours and start crawling around the -- I start crawling around and trying to inspect it to see, you know -- I thought maybe I would see some type of explanation of something if there was a mist from whatever these cartridges are or I just didn't know what I was going to encounter, but as soon as I got my face right up to the thing, I mean, you know, it immediately -- I immediately stopped breathing, and I started choking, and I got up, and I was trying to -- I was trying to catch my breath, and the more that I tried to breathe, the more I felt like I was just suffocating. My throat was just closed up, and I was trying to get away from it and I tried to -- I was kind of like in a panic mode, and I just -- I remember just stumbling and trying to get towards the house, you know, because I couldn't breathe, and I felt like I needed to -- I needed to take fresh air…" (pp. 76-7).  He became nauseated and threw up outside.
8. "… as you walked up towards it, how close were you to it when you first began to feel the effects, the physical effects, whether from the machine or not, but just physically how you began

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447           Fax:
Email:    doctor4n6@gmail.com     Website:    www.forensics-tlb.com

to feel different? A. That was 2 to 3 feet. Q Were you standing at that point in time? A No, I was kneeling next to it." (p. 80).  "…I had to squeeze my head in there, and I was right up face to face with it, and that's when I could feel -- It felt like a heat, and I actually feel like something, like I could feel gas or air coming from it, and then as soon as -- As soon as I caught a whiff of that, that's when I immediately started suffocating." (pp. 85-7).

9. Det. Cesark "… brought me a glass of water like this, and I may have drank half of it. I don't recall how much I drank.  Q. A normal-sized glass? A. I mean, I remember that I was feeling -- I remember, as my throat was burning, I had like a burning sensation in my throat, and so the water was soothing to my throat, but at the same time, I still felt nauseous…" (p. 93). His fellow officers called for EMS, and they arrived in 10-15 minutes. He walked to their unit, where he was administered oxygen with nasal prongs.
10. They noted his report then stated he was told his CO level was 7, and as a non-smoker is should be zero. (p. 101).  His "ETCO2 was 30-32 mm Hg. (p. 103).  He was told if his CO level were 8 he would have been taken to St. Mary's and been placed in the hyperbaric chamber.
11. They also talked of the Mosquito Magnet as evidence and how it was handled that day.

His exhibits included his report, 246 photographs and a sketch (exhibit 15, below).



**Det. Kimberly Cesark,** also with the Palm Beach Gardens PD, was deposed on 10-27-15.  The attorney representing the Tire Company that distributed the CO2 cartridge asked questions first.  She arrived at the residence at 1721, before Det. Broehm, she meeting with Officers Soule and Adorno who were already there, her log indicating Det. Broehm getting there at 1825 (not 1745, as he indicated in his depo).  She stayed at the scene until 2105.  She took photos, and was standing by Det. Broehm when he was on all fours by the bushes (p. 46).  She felt fine.  Det. Broehm was sweaty and dry-heaving, and he stood up and staggered, she claiming she helped make sure he didn't walk to the pool (pp. 54-7).  She didn't feel anything the entire time (p. 58, 70), nor did any other officer have complaints.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com

**Robert Cruz** was deposed on 11-17-15, as an employee and corporate representative of Woodstream. Other than this case, he did not know of "any consumer complaints or any investigations concerning injury or death, which somebody has alleged injury or death as related to the Mosquito Magnet product" (p. 80).

**Rick Eyer** was deposed on 11-17-15. He had been an engineer with Woodstream, but had left for a larger group.

**Marko Lubic** was deposed on 11-16-15, as a representative of Woodstream. He also was not aware of "any other lawsuits, customer complaints, investigations in which someone has alleged injury or death dealing with the Mosquito Magnet product" (p. 48).

**Gary Roulston** was deposed on 11-16-15, also as a corporate representative of Woodstream. He also was unaware of any other complaints or deaths from this product (p. 70).

**OPINIONS:**   After review of the above, I offer the following opinions, each to a reasonable degree of medical certainty:

1. Death is a process, not an event. Death is defined across the US as the irreversible cessation of spontaneous circulation and respiration, or the irreversible cessation of circulatory or respiratory functions.",[i] Dying is the process leading to the moment of death, and is not an instantaneous event. In this process of dying, it is not at all uncommon for an individual to have agonal breaths or heartbeats. The various tissues and organs of the body do not require that there be any consciousness to operate. As dying occurs, the various tissues lose their functions in degrees over time, dependent upon the tissues. Further, not all tissues will lose their functions at the time death is pronounced; hence we can have the variety of tissue and organ donation procedures that have become so common in medicine.

    a. Circulation and respiration do not require or imply consciousness.

    b. Individuals can and will breathe for a period of even a minute or more following cardiac arrest, and possibly longer for other cardiac events. [ii]

    c. The heart has its own intrinsic pacemaker, and will continue to beat for even 5-10 minutes or more following complete cessation of respiration and/or lethal brain injuries. Although the brain can influence the rate of heartbeats, the heart does not need any input from the brain to beat.

2. I agree that Ms. McCool's cause of death is best ruled as "Drowning". She was found floating in their swimming pool, face down and slumped forward, which is a common way for a body to come to equilibrium in fresh water. In a diagram (from Spitz, WU. Drowning. **Hosp Med**. 5:11, 1969), what is often referred to as the "dead man's float":

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com



While the findings of the scene and autopsy are not specific for drowning, and there is not a recognized definitive test for drowning, the preponderance of evidence here supports that conclusion. [iii] She has significant pulmonary edema and congestion at autopsy, which are common in fresh water drownings, but which also may be produced by the resuscitative efforts as well as the process of dying itself.

- a. Dr. Sawyer wrote, in his report, that drowning was unlikely because, "First and foremost, Dr. Wolford did not detect the sounds usually heard in the lungs of a drowning victim. Additionally, he opined that there was not much fluid in Mrs. McCool's lungs as normally would be consistent with drowning."   These findings were after cardiopulmonary resuscitative measures had been performed to the hospital, and are neither diagnostic nor even expected findings.  Further, "consistent with" does not equate to "more probable than not" or "to a reasonable degree of medical certainty".

- b. In a 2002 study of drownings, "External foam, frothy fluid in airways, and overlap of the anterior margins of lungs were found in 275 (17.3%), 739 (46.5%), and 669 (42.1%) of the cases, respectively, but no one of these changes, tested against dry-land controls, were specific for drowning. The association of external foam and overlap of the lung margins was exclusive of drowning but was observed in only 176 cases (11.1%). After cross-analysis, 964 (60.6%) of the cases had no circumstantial data or macromorphologic pathologic findings that allowed a definite diagnosis of drowning". [iv]

- c. An excellent discussion of the various findings associated with drownings and how the cause of death is established, a discussion geared for medical students, may be found at http://www.forensicmed.co.uk/pathology/bodies-recovered-from-water/

3. The cause for Ms. McCool to enter the pool and become unresponsive is unknown.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com     Website:   www.forensics-tlb.com

    a. She was taking Wellbutrin, which has possible seizures as a recognized complication. Seizures are functional changes which leave no definitive physical findings to allow specific postmortem diagnosis, especially when unwitnessed. [v]

    b. Scalp contusions were documented ("A 2-1/2 inch contusion is on the vertex of the subgaleal scalp. A 2-1/2 inch contusion is in the midfrontal subgaleal scalp. A 1 inch contusion is in the right frontal subgaleal scalp"), but no underlying brain injuries were described or seen grossly or microscopically. A concussion is diffuse brain injury with loss of function, where there can be little or no structural damage to the brain detectable at autopsy. [vi]

    c. Where there is no patterned injury described on the skin surfaces overlying the scalp bruises, the most probable instrument impacted by her head would be a broad blunt surface. However, because of the separate locations of the bruises over the curved contour of the scalp/head, three distinct impacts are indicated, which are not accounted for in the forensic evidence I have reviewed.

    d. Zolpidem (Ambien) dependency and withdrawal seizures have been documented in the literature, with this possibility following the reasoning of "3a", above. [vii]

    e. It is recognized that other substances, such as "Cutter Backyard", were used recently in the backyard. The active chemicals in these insecticides, which are collectively called "pyrethrums", are not toxic to humans, especially in the open air.

4. There is no forensic evidence that any substance emitted by the "Mosquito Magnet" caused or contributed to her death.

    a. Carbon monoxide (CO) is absorbed onto the hemoglobin molecules by competing with oxygen for the binding sites. Even with concentrations of CO at levels of 12.800 ppm (over 1% in the atmosphere, a very high level and a level far beyond what is achieved by the Mosquito Magnet, especially in the open air), it takes several minutes exposure to achieve significant and lethal levels in a person. [viii]

        i. The levels of carbon monoxide found in these records are insufficient to cause death or loss of consciousness or even significant symptoms. [ix]

        ii. The carbon monoxide (CO or COHb) level found at autopsy is a true reflection of the level present at death. Measured postmortem levels may tend to rise, depending upon the methodology used to test the blood or muscle sample, because of the continued extraction of oxygen as the tissues use whatever glucose and oxygen and other substances present in their process of dying. However, the carbon monoxide is bound very tightly to the hemoglobin/myoglobin molecules, and will remain so, even with cardiopulmonary resuscitation.

        iii. Because of the long half-life (5-6 hours) for carbon monoxide dissipation from blood while a person is alive, and because cardiopulmonary resuscitation is a suboptimal substitute for a person's own breathing and circulation, even with supplemental oxygen there is an insignificant change in a person's COHb level in this time frame.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com       Website:   www.forensics-tlb.com

    b. Sulfur dioxide ($SO_2$) levels measured in testing were reportedly slightly elevated when a new machine was first started for testing, but dropped rapidly. Dr. Sawyer, plaintiff's expert, wrote in his report, "...there is evidence from a newly purchased Patriot Mosquito Magnet® that sulfur dioxide can be generated at start-up at levels of 2 PPM (5,244 ug/m3). This level of exposure is consistent with bronchoconstriction among sensitive subjects or asthmatics." (*vide supra*)   Levels of 0-1 ppm may be found in the atmosphere, from the burning of sulfur-containing fuels. Atmospheric levels of up to 2-5 ppm are current guidelines for long-term and short-term exposures, respectively, and the highest measured levels emitted are within these guidelines in the testing results. [x]  We have no evidence that Ms. McCool was asthmatic or unusually sensitive, as Dr. Sawyer speculated.

    c. Other substances that were speculated as possibly involved by Dr. Sawyer, such as sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$) or hydrogen sulfide ($H_2S$), or even Hydrogen Chloride (HCl) or Hydrogen Cyanide (HCN), are just subjects for speculation, with no support found in any testing results I have reviewed. We must remember that these events also occurred in the open atmosphere, and the allegations of any toxic gas exposure must be viewed in the conditions of the weather that day.

5. We currently do not have reliable methods to test an individual after their death for the concentrations of substances such as chlorine in lung water in drownings, sulfur dioxide in atmosphere or intraairway gases from inhalation, hydrogen chloride in inhaled atmosphere, etc., where the components of the gas or fluid are also normal and common components of our bodies. [xi]

6. It was reported that Ms. McCool had a $CO_2$ level of 54 when checked during the resuscitative efforts. We must not confuse $CO_2$ (carbon dioxide – a normal constituent of expired air) with CO (carbon monoxide, a molecule with only one oxygen atom, and a molecule reflecting incomplete combustion of carbon-containing fuels. A small amount is produced normally in the body but the majority in an elevated blood measurement is usually coming from smoke and similar exhaust inhalation).

    a. Our normal level of $CO_2$ in the living state will be in the range of 23-33 mEq/L, but this level will rise rapidly with cardiopulmonary arrest (such as when she is requiring CPR, and her GCS – Glasgow Coma Scale – is 3), where the tissues of the body will continue to utilize whatever oxygen and glucose, etc., is present.

    b. We normally have a small level of CO/COHb in our blood. From the metabolism of hemoglobin (the molecule in our red blood cells that carries oxygen), a normal person will have a baseline level of up to 2-3% saturation with CO. Smokers, those with increased hemoglobin metabolism (such as hemolytic anemias) and those working around chemicals such as methylene chloride (e.g., in paint strippers, etc.) may have significantly elevated COHb levels above this baseline - levels as high as 8-10% or so - with no significant toxic effects from any decreased oxygen-carrying capacity in their blood. Further, measured COHb levels can continue to rise after death because of the continued extraction of oxyhemoglobin. [xii]

    c. During the process of dying, our tissues will continue to utilize oxygen (hence the oxygen levels drop rapidly), produce organic acids such as lactic acid (hence the pH will drop), produce $CO_2$ (hence these $CO_2$ levels will rise) and utilize glucose (so that these levels will rapidly drop) – all of which are changes seen in the laboratory values for Ms. McCool.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com     Website:   www.forensics-tlb.com

7. Detective Broehm reported his CO level, measured in the field, was 7% saturation. This level is neither enough to cause him any symptoms, nor is it apparently accurate.

   a. He arrived at the scene around 1824 (per the deposition and log of Detective Cesark), experienced his nausea and other symptoms when he got outside to the area of the hedges and pool and ultimately the machine, and reportedly got to the Emergency Room for a blood sample to be drawn at around 2030. It is of note that EMS workers, who had already been working closely with Ms. McCool along the pool, and who reportedly wear CO monitors, were neither symptomatic for any exposure, nor did their monitors alert to the presence of elevated levels of CO.

   b. His brief exposure to the machine before he became symptomatic argues against carbon monoxide, as CO is not absorbed that rapidly at these concentrations (less than 1,000 ppm in the open air). Neither is CO so rapidly dissipated that his level would change significantly in this time frame to be only 7% with the Rad-57 test administered at 1921.

   c. Less than two hours later, his level was 1.1% with Co-oximetry at the ER, using a testing method that is different than the Rad-57, and measured by a test performed in a lab with standards and controls run on the machine to ensure accuracy and precision before levels are reported. It is medically impossible for his COHb level to rapidly drop to 1.1% in less than two hours with him breathing room air (21% oxygen) or supplemental oxygen by nasal prongs (~40% oxygen in the actual atmosphere breathed).[xiii]

   d. The accuracy of field testing for CO by the Rad-57 has a standard deviation of 3%, and is very user-dependent. [xiv]

   e. Dr. Sawyer assigns significance to the reports of Detective Broehm, symptoms that were not reported by any other officer or responder there, or even the decedent's son or his girlfriend. He wrote, "Of significance, Detective Broehm experienced asphyxiating effects while on his hands and feet in very close proximity ("*right up to the thing*") to the Mosquito Magnet which gives rise to the suspicion of a sulfur dioxide as a probable suspect in Mrs. McCool's death." and "By history, Detective Broehm inhaled an acute respiratory irritant from the device. "*As soon as I got my face right up to the thing, I immediately stopped breathing and I started choking...*" He began to panic and tried to get away from the device as quickly as possible."

      i. Note that Detective Broehm started to experience these symptoms (i.e., dizziness, unsteadiness and nausea) when he got down to inspect under the hedge, at a distance of approximately 35 feet from the Mosquito Magnet.

      ii. Det. Broehm had complaints of sudden onset of breathing problems when he got down close to the machine, while no other officer or individual approaching the machine or standing by him experienced any similar symptom. The exact cause for him to have these sudden complaints is unknown, based upon the scene information, EMS and hospital testing, and subsequent product testing. There are many potential causes for these signs and symptoms, which have not been investigated or ruled out.

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com       Website:   www.forensics-tlb.com

      iii. Dr. Sawyer concludes, "To a reasonable toxicological certainty, I have not been able to ascertain any alternative, reasonable cause of Mrs. McCool's death and the concurrent adverse health effects experienced by Detective Broehm." This failure to find any other cause does not establish reasonable medical probability of causation.

  f. Dr. DiMaio speculates in his opinions about the possibilities that carbon monoxide or sulfur dioxide may be involved. These opinions are apparently not being offered to a reasonable degree of medical probability for causation. Further, the CO discussion gives a qualifier for carbon buildup, which is not expected in a new machine, and the sulfur dioxide discussion only mentions it as a possibility and that it "may be".

  g. There is no evidence to support the speculation that Ms. McCool ever approached the Mosquito Magnet device in any fashion similar to that Detective Broehm reported as his actions. There is no evidence that she had any history of unusual sensitivity or reaction to the alleged substances from the machine, either. It is recognized that the levels of 1-2 ppm sulfur dioxide cited by Dr. Sawyer are within the levels the CDC has found and ruled acceptable for long term exposure of individuals to sulfur dioxide.

  h. I have found no other report of similar complaint in a review of the medical literature or internet search, supporting the depositions of the various Woodstream representatives.

  i. Whatever caused the rapid onset and then resolution of symptoms and complaints in Detective Broehm, the medical presentation and forensic evidence gathered all indicate that it is not a product from the Mosquito Magnet. There are other environmental or medical reasons to explain his complaints.

8. While it may be tempting to try to implicate the Mosquito Magnet, this is still unsupported by the forensic evidence. "*Post hoc, ergo propter hoc*" (meaning, "after it, therefore because of it") is a common contention, trying to claim that chronology is equal to causation, but it is not scientific or even acceptable.

If additional information becomes available that has a bearing on these conclusions, these conclusions will be amended or supplemented appropriately. I hope these points are of assistance. Please let me know if there is anything more I can do or need to provide.

Sincerely,

*Thomas L. Bennett, M.D.*

Thomas L. Bennett, M.D.
Forensic Pathologist

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447            Fax:
Email:   doctor4n6@gmail.com       Website:   www.forensics-tlb.com

[i] THE **DEFINITION OF DEATH**. **Death** occurs upon the irreversible cessation of circulatory and respiratory functions or upon the irreversible cessation of all brain functions including the brain stem. (Section 382.009(1), **Florida** Statutes.)

[ii] Zuercher M, et al.  Continued breathing followed by gasping or apnea in a swine model of ventricular fibrillation cardiac arrest   **BMC Cardiovascular Disorders** 2010, 10:36.

[iii] Piette MH[1], De Letter EA.   Drowning: still a difficult autopsy diagnosis.   **Forensic Sci Int.** 2006 Nov 10;163(1-2):1-9. Epub 2005 Dec 27.

[iv] Lunetta P[1], Penttila A, Sajantila A.   Circumstances and macropathologic findings in 1590 consecutive cases of bodies found in water.   **Am J Forensic Med Pathol.** 2002 Dec;23(4):371-6.

[v] Rissmiller DJ and Campo T.  Extended-Release Bupropion-Induced Grand Mal Seizures.  J Am Osteopath Assoc. 2007;107:441-442.

[vi] Shaw NA.  The Neurophysiology of Concussion.  **Prog in Neurobiol** 2002, 67:281-344.

[vii] Keuroghlian AS, Barry AS, Weiss RD.   Circadian dysregulation, zolpidem dependence, and withdrawal seizure in a resident physician performing shift work.   **Am J Addict**. 2012 Nov-Dec;21(6):576-7.

[viii] Fire and Explosion Deaths and Injuries.  **NFPA 921 Guide for Fire and Explosion Investigations** – 2014 edition, Chapter 25.

[ix] Benignus VA, Kafer ER, et.al.  Absence of Symptoms with Carboxyhemoglobin Levels of 16-23%.   **Neurotox and Teratology** 1987;9:345-8.

[x] https://www.osha.gov/dts/sltc/methods/inorganic/id104/id104.html

[xi] CDC - NIOSH Pocket Guide to Chemical Hazards - Sulfur dioxide.

[xii] Ellenhorn MJ and Barceloux DG.  **Diagnosis and Treatment of Human Poisoning**.  Elsevier Publishers, Amsterdam.  Pages 820-9, spec. p. 825.

[xiii] Ellenhorn MJ and Barceloux DG.  **Diagnosis and Treatment of Human Poisoning**.  Elsevier Publishers, Amsterdam.  Pages 820-9, spec. p. 825.

[xiv] Masimo's **Clinical and Product Information Packet** - http://www.masimo.com/pdf/rad-57/LAB8001A_Booklet_Clinical_and_Product_Information_Package_Grant_Assistance.pdf

**Forensic Medicine and Pathology, PLLC**
6 Canyon View Drive, Sheridan, WY   82801
Office and cell phone: 406-855-5447          Fax:
Email:   doctor4n6@gmail.com      Website:   www.forensics-tlb.com