UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:15-CV-80504-ROSENBERG/BRANNON

DANIEL McCOOL, as Personal
Representative of the Estate of Mary J.
McCool, Deceased for the benefit of
the decedent's survivors and estate,

      Plaintiff,

v.

WOODSTREAM CORPORATION, a foreign
Corporation, HOME DEPOT USA, INC., a
foreign corporation & ACCESSORIES MARKETING,
INC., a foreign corporation,

      Defendants.
_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants' Motion for Summary Judgment [DE 158]. The motion has been fully briefed and the Court heard oral argument on the motion on May 13, 2016.

This motion raises the question of whether Plaintiff has marshalled enough evidence to be entitled to a trial by jury. The facts and circumstances in this case involve a certain amount of mystery and confusion as to how and why the decedent in this case met her untimely death. Defendants are of the position that Plaintiff's evidence is speculative, vague, and void of any concrete evidence of a connection between Defendants' manufactured product, a mosquito magnet, and the decedent's demise. Plaintiff argues there is sufficient circumstantial evidence to try this case to a jury and, to the extent alternative explanations exist for the decedent's cause of

death, it is Defendants—not Plaintiff—that are in the best position to know whether their products are capable of inflicting the injury at the heart of this case.

## I.     FACTS OF THE CASE

Many of the facts in this case are undisputed.  The decedent in this case, Mrs. McCool, was found face down in her pool. DE 158 at 6.[1]  She was found wearing her shoes and fully clothed.  DE 194 at 3.  There were no eye-witnesses as to how Mrs. McCool ended up in her pool.  DE 158 at 6.  Detective Broehm was assigned to investigate Mrs. McCool's death. *See id.*  After Mrs. McCool's body was examined, Detective Broehm was informed that Mrs. McCool's lungs did not contain an amount of water that is generally consistent with death by drowning. *See* DE 151-8 at 16-17.  Detective Broehm therefore investigated the scene of Mrs. McCool's death for alternative causes of death.  *See* DE 194 at 1-2.

Initially thinking that Mrs. McCool could have been struck by a golf ball (from a nearby golf course) Detective Broehm began to check under bushes in Mrs. McCool's back yard for golf balls.  *See* DE 151-8 at 47.  Upon doing so, Detective Broehm began to feel dizzy.  *Id.* at 48.[2]  He went to a different area in the McCool back yard to recover.  *Id.* at 65-66.  Around this time, investigators noticed that inside the McCool house there was discarded packaging pertaining to refueling cartridges for a machine called the "mosquito magnet".  *Id.* at 64-69.  Near the packaging was a receipt, dated the morning of Mrs. McCool's death, for the cartridges.  *Id.* at 69-70.  In light of the fact that the packaging for the cartridges contained warning labels concerning

---

[1] In light of the voluminous record in this case, the Court occasionally cites to a party's statement of facts which in turn cites to record evidence.  To the extent any of the cited facts are disputed, the Court sets forth such facts here for background purposes.

[2] At this time, Detective Broehm was somewhere between twenty and thirty-five feet away from the mosquito magnet machine.

the possibility an individual could lose the ability to breath, Detective Broehm decided to locate the mosquito magnet machine. *See id.* at 71-73.

Upon discovering and kneeling by the mosquito magnet machine, Detective Broehm began to feel "even more pronounced than prior to when I was looking for the [golf ball] . . . I really felt dizzy at this time, and I did not feel good." *Id.* at 76. After reporting his symptoms to a fellow officer, Detective Broehm resolved to place his face "right up" to the machine. *Id.* at 77. Upon doing so, Detective Broehm reported the following:

> I immediately stopped breathing, and I started choking, and I got up, and I was trying to -- I was trying to catch my breath, and the more that I tried to breathe, the more I felt like I was just suffocating. My throat was just closed up, and I was trying to get away from it and I tried to -- I was kind of like in a panic mode, and I just -- I remember just stumbling and trying to get towards the house, you know, because I couldn't breathe, and I felt like I needed to -- I needed to take fresh air, so to speak, but to me, fresh air was in the house because it was going to be away from this thing, and it just -- It was pretty scary, and I remember I threw up, and again, I was concerned about, number one, throwing up and contaminating the crime scene, and number two, it was just a very nice home and I didn't want to throw up out on the patio. There was some nice carpeting and stuff out there, you know, and I just gathered myself until I was no longer regurgitating and slowly -- At this point, I was standing next to the -- I was standing right next to the sliding door, and at the point in time where I was no longer going to regurgitate and having gotten a little bit of my breath back, I went in the door, and I remember, just as quickly as I could, sitting down and throwing the couch to the – There was a couch there and just throwing the couch to one side and just sitting down on the couch and just sitting there and trying to gather myself.

*Id.* at 77-78. Another law enforcement officer, Sergeant Soule, observed Detective Broehm's reaction:

> Q. Was there any point in time that Detective Broehm appeared ill or told you that he was feeling ill?
>
> A. There was one, definitely one remarkable time where he was looking. I believe he at that time located the mosquito magnet and he was close to it, and I believe like as he was talking to me about that he immediately started like gagging and you know, stood up and staggered. You know, I recall seeing him doing that. I

> was extremely concerned that, you know, six hours prior to that somebody had deceased on the back patio and now he was experiencing symptoms that I had not seen anything like that before in any of my experience, somebody that quickly go from speaking normally to throwing up and dry heaving.

DE 174-5 at 55.  A third law enforcement officer, Detective Cesark, was forced to protect Detective Broehm from falling into the pool in which Mrs. McCool died:

> Q. When you -- when you put in your report that Detective Broehm got violently ill, and by reading your report today about him becoming violently ill, does that refresh your memory as to what happened when he was staggering backwards?
>
> A. Yes.
>
> Q. Okay. And you said you had to put your hand on him; is that right?
>
> A. To stop him. Because he was getting close to the pool.
>
> Q. And it was on his back?
>
> A. Yes, he was walking backwards, and I stopped him.
>
> Q. Okay. And he was walking backwards toward the pool?
>
> A. Right.
>
> Q. Okay. If you had not stopped him, do you think his motion would have carried him into the pool?
>
> A. Yes. That's why I stopped him.

DE 174-7 at 149-50 (objections omitted).

After Detective Broehm experienced the foregoing, paramedics were summoned.  DE 194 at 5.  Oxygen was administered to Detective Broehm.  *See id.* at 2.  Detective Broehm's blood was tested for carbon monoxide.  *Id.*  Initially, at the scene, this test showed a higher than normal reading of 7%, followed by a subsequent reading of 4.4%.  *See id.*  After Detective Broehm was hospitalized, a blood test showed a carbon monoxide level in his blood of 1.1%,

which represents a normal reading. *See id.* Carbon monoxide is a byproduct of the mosquito magnet's internal combustion process. *See id.* at 7. Excess carbon monoxide was not detected by certain carbon monoxide detectors in the McCool's back yard held by first responders. DE 158 at 7.

At some point on the night of Mrs. McCool's death, an unknown person disassembled the mosquito magnet. *See id.* At a later inspection, a technician remarked that when the machine was reassembled, it was reassembled incorrectly. *Id.* In light of that incorrect reassembly, the technician could not get the mosquito magnet to activate or ignite. *Id.* at 8. No subsequent test has successfully shown the mosquito magnet to emit excess carbon monoxide. *See id.* at 7. There is evidence, however, that the mosquito magnet machine in this case was not working properly. At a later test (by Plaintiff), an engineer was able to get the machine to ignite. DE 194 at 6. At that time, the machine did not emit detectable amounts of carbon *dioxide* (in an area around the machine). *Id.* at 7. This is notable considering carbon *dioxide* is supposed to be the primary emission from the machine as it is carbon dioxide that is supposed to attract mosquitos. *See id.*

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of*

*Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48).  A fact is material if "it would affect the outcome of the suit under the governing law." *Id.* (citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  The Court does not weigh conflicting evidence.  *See Skop v. Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).  Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment.  *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party.  *See Shiver*, 549 F.3d at 1343.

### III.   ANALYSIS

Defendants argue in their motion for summary judgment they are entitled to summary judgment on two different grounds: (A) Plaintiff has produced no evidence the mosquito magnet

was defective and (B) Plaintiff has produced no evidence that a defect proximately caused injury to Mrs. McCool. The Court addresses each ground in turn.

### A. Plaintiff's Evidence of Defect

Defendants argue in their motion for summary judgment that Plaintiff has no expert prepared to testify that the mosquito magnet was defective and unreasonably dangerous. Instead, Defendants argue, Plaintiff's experts are merely expected to testify as to potential defects. In response, Plaintiff argues that it is not required to have an expert prove that the mosquito magnet was defective. Plaintiff's position is premised upon the case of *Cassisi v. Maytag Co.*, 396 So. 2d 1140 (Fla. Dist. Ct. App. 1981), which established an exception whereby a plaintiff need not prove through an expert that a product is defective to survive summary judgment. Instead, pursuant to *Cassisi*, a plaintiff may rely upon an inference (in some circumstances) to establish a prima facie case and take the case to a jury.

In *Cassisi*, a home was destroyed by a fire. *Id.* at 1143. An expert for the plaintiff in that case concluded that the fire had originated inside a dryer. *Id.* Despite this conclusion, the expert could not pinpoint *what* defect in the dryer had caused the fire. *Id.* Problematically, the expert could not rule out such possibilities as: the fire originated outside of the dryer, and then was drawn into the interior, that clothes (not a defect) caused the fire, or that circuit breakers powering the dryer were the source of the fire. *Id.* The defendants objected on the grounds that the plaintiff had failed to establish a causal connection between their product and the plaintiff's injuries because the plaintiff had been unable to negate all alternative causes of the fire other than the defect. *Id.* at 1147. After an extensive survey of case law in this area, the *Cassisi* court decided to adopt into Florida law the holding in the case of *Greco v. Bucciconi Engineering Co.*,

283 F. Supp. 978, 980 (W.D. Pa. 1967), a case which fully developed the proposition that a plaintiff, under certain circumstances, need not rule out all alternative explanations for an injury in a strict products liability case.

In *Greco*, the defendant was an engineering company that designed a machine to stack and transport steel. *Id.* Part of that machine was a set of mechanical fingers that extended to support the piles of steel. On one occasion, the fingers suddenly retracted and a falling pile of steel sheets injured the plaintiff. *Id.* Although the plaintiff in *Greco* sued the engineering company that designed a portion of the mechanical system, the defendant in that case was not responsible for the design or manufacture of the control panel for the piling system or for the compressed-air that powered the system. *See id.* at 983-85. The defendant argued that the case never should have been submitted to a jury because there was no evidence that the jury could infer a defect existed in the portion of the machine defendant was responsible for, as opposed to a different portion of the machinery or system. *See id.* Thus, the defendant argued, the jury's verdict was speculative. *See id.* The *Greco* court rejected that argument, stating that a "finding that the malfunction was prompted by a defect in the control panel or air system would be equally 'speculative'; no evidence in support of these theories having been adduced. A malfunction evidences a defect." *Id.* at 984.

The *Cassisi* court applied the holding in *Greco* to the defective dryer in *Cassisi*, noting: "The *Greco* inference is particularly appropriate here. Combined with the expert's testimony indicating that a malfunction in the dryer was the cause of the fire, Mrs. Cassisi testified that the product had never been serviced or repaired, and that it had been normally operated during its 19 months' use. Given such evidence, it is immaterial that the plaintiffs failed to identify the

specific cause of the malfunction since it is inferred that the malfunction itself, under such circumstances, is evidence of the product's defective condition at both the time of the injury and at the time of the sale." *Cassisi*, 396 So. 2d at 1152-53. Thus, before the holding in *Cassisi* can apply, there must be evidence of a malfunction, such that the malfunction itself presents the inference that the product is defective. *Id.*

Defendants raise factual and legal objections to Plaintiff's reliance upon *Cassisi*. The Court first considers whether, as a factual matter, *Cassisi* should apply to the instant case.

**(1) The Factual Application of the Instant Case to *Cassisi***

Under *Cassisi*, evidence of a product malfunction must be established by testimony from a plaintiff or from eyewitnesses. *See Ainsworth v. KLI, Inc.*, 967 So. 2d 296, 302 (Fla. Dist. Ct. App. 2007). Here, Mrs. McCool cannot testify to the alleged malfunction, as she is deceased. Thus, the Court considers the testimony as to the malfunction of the mosquito magnet machine from other sources.

The facts in this case are highly unusual. The mosquito magnet machine has limited fuel. It was operating at the time of Detective Broehm's investigation. The purpose of the machine is to attract mosquitos. At the time of her death, Mrs. McCool was preparing her back yard for a party. The machine was presumably operating for that purpose. Mrs. McCool visited Home Depot hours before her death. At Home Depot, she purchased cartridges for the machine. Receipts for that purchase and discarded mosquito magnet cartridge packaging were discovered in her trash can.[3] There is adequate evidence to reasonably infer that Mrs. McCool was

---

[3] As discussed at oral argument, evidence that Mrs. McCool installed the cartridges is not limited to the discarded packaging and receipts—the cartridges found in the magnet machine also support that inference.

operating the mosquito magnet near the time of her death, and that she was in very close proximity with the machine to install cartridges and otherwise activate the machine.

Detective Broehm came in close contact with the mosquito magnet machine too. As a result of his close contact, he lost the ability to breathe, suffered severe choking and vomiting, and started to fall into the pool in which Mrs. McCool died. He was saved from falling into the pool by a fellow officer. After being administered pure oxygen for some period of time, his blood was tested for carbon monoxide. That test showed an unusually high amount of carbon monoxide in his blood. Finally, there is evidence that Mrs. McCool was more sensitive to carbon monoxide gases than the average person because she had an enlarged heart.

The evidence of product defect in this case is the testimony of Detective Broehm. Detective Broehm exhibited strong symptoms of sickness when in close proximity to the mosquito magnet machine. When he placed his face "right up" to the machine, he immediately stopped breathing, started choking, and felt his throat close up. He further testified that the more he tried to breathe, the more he felt like he was suffocating. Another police officer on the scene who observed this physical reaction stated that he had "never seen anything like it," and a third officer was forced to intervene to keep Detective Broehm from staggering and falling into a pool—the same pool in which Mrs. McCool was found dead. This was not some mild reaction. Detective Broehm exhibited severe symptoms after placing his face in close proximity to the mosquito magnet machine. Paramedics were summoned to assist Detective Broehm and he was taken to a nearby hospital. These are not symptoms that should occur during the normal operation of the machine. Indeed, it is Defendants' position that it is impossible for the mosquito magnet to cause these types of symptoms through the release of excess carbon monoxide.

These facts are persuasive to the Court, when considering *Cassisi*, for reasons other than the severity of the symptoms. Detective Broehm did not develop his symptoms in connection with some other mosquito magnet machine, at some other location, nor did he develop his symptoms at a time far removed from the death of Mrs. McCool. He encountered his symptoms during his investigation into Mrs. McCool's death.[4] While his symptoms were not coterminous with Mrs. McCool's death, they almost were (a matter of hours). The evidence shows that the machine remained in operation from the time of Mrs. McCool's death until the time Detective Broehm was exposed to it. Moreover, the fact that Detective Broehm's reaction to the mosquito magnet was to begin to fall into the pool in which Mrs. McCool drowned (had he not been protected from doing so by a fellow officer) is important to this Court. Finally, soon after experiencing the foregoing, Detective Broehm was tested for carbon monoxide poisoning by a paramedic. That test registered an unusually high level of carbon monoxide in his blood.

Detective Broehm's reaction at the scene of Mrs. McCool's death was mere hours after she died. If the facts of this case are analogized to the facts in *Cassisi*, a first responder, on viewing the scene of the fire soon after the event, might have been burned by a sudden plume of flame from the dryer machine. No one was present to observe a product defect at the time of Mrs. McCool's death, just as no one was present to observe the burning dryer in *Cassisi*. However, like *Cassisi*, there is evidence of a product malfunction in this case. Moreover, *Cassisi* relied upon *Greco*, and in *Greco* the appellate court noted that the defendants' theory of the case

---

[4] The Court rejects the argument by Defendants that if Detective Broehm experienced some light dizziness while distant from the magnet machine, and if that dizziness was unrelated to the machine, then as a matter of logic his later severe symptoms from being adjacent to the machine **must** be unrelated. Viewing all facts in the record in the light most favorable to Plaintiff, at the very least a question of material fact exists as to whether Detective Broehm's earlier dizziness was related to the magnet machine and, if not, whether his subsequent severe reaction may be traced to the machine.

was just as speculative as the plaintiff's. The Defendants' theory of Mrs. McCool's cause of death could adequately be described as just as speculative as Plaintiff's theory. There is no alternative, *likely*, explanation.

### (2) Defendants' Legal Objections to the Application of *Cassisi*

<u>The availability of the mosquito magnet machine for testing.</u> Defendants object to the application of the *Cassisi* inference because unlike *Cassisi*, the mosquito magnet machine is available for testing—it was not destroyed. *Cassisi* does not require that the product alleged to be defective was destroyed. *See Cassisi*, 396 So. 2d at 1149, 1151; *Ainsworth*, 967 So. 2d at 302; *Jones v. Heil*, 566 So. 2d 565 (Fla. Dist. Ct. App. 1990). The machine in *Greco*, upon which *Casssisi* relied, was not destroyed. *See generally Greco*, 283 F. Supp. at 980-85.

<u>The normal use of the mosquito magnet</u>. Defendants argue that *Cassisi* does not apply because there is no evidence Mrs. McCool was using the mosquito magnet "normally" which is in turn a prerequisite for the *Cassisi* inference to apply. For example, Defendants argue there is no evidence the machine was "20-24 inches" from any object as the manual for the machine requires. The machine was adjacent to a bush. Had the machine been 19 inches from a bush, the Court would be hard pressed to conclude that the McCool family is precluded from a trial by jury as a matter of law. In any event, the normal use requirement in *Cassisi* "is based on the consumer expectations test from the Restatement of Torts (Second), which asks whether 'the ordinary consumer's expectations [are] frustrated by the product's failure to perform under the circumstances in which it failed.'" *Edic v. Century Products Co.*, 364 F.3d 1276, 1285 (11th Cir. 2004) (quoting *Cassisi*, 396 So. 2d at 1144-45). Whether or not a particular use is "normal" is generally a question for a jury. *See id.* Here, the purpose of the machine is to catch mosquitos

outside. The evidence is that the machine was being used in a back yard in connection with Mrs. McCool's preparations for an outdoor party. It was being used against mosquitos. The Court is satisfied that, at a minimum, the normal use of the mosquito magnet machine in this case presents a question of material fact that should be submitted to a jury.[5]

<u>Policy reasons why *Cassisi* should not be applied.</u>  Defendants argue that Plaintiff is using *Cassisi* as an offensive measure, like a sword, in such a way as to become exempt from providing testimony from an expert that the mosquito magnet was defective. It is true that the purpose of the *Cassisi* inference is to afford a shield to a plaintiff—not a sword. *See Ainsworth*, 967 So. 2d at 303. *Cassisi* should not be used by a plaintiff as a weapon to avoid the effort and necessity to obtain proof of a product defect—and instead rely upon an inference to take a case to a jury. *See id.* The Defendants' argument on this point, however, is unpersuasive for two reasons. First, Plaintiff did attempt to test the machine in this case, but the Plaintiff's test (via an engineering expert) was inconclusive. The testimony of Plaintiff's expert Dr. Kalotfen appears to be that when he tested the machine, it did not emit a plume of carbon dioxide as it was supposed to. A permissible and reasonable inference is that if the machine is not operating properly with respect to carbon dioxide—what else is not operating properly?

Second, it is not clear to this Court that the machine can be tested in such a way as to definitively determine what happened on the day Mrs. McCool died. This is because the

---

[5] In the event Defendants prove at trial that the maintenance and use of the machine were so grossly improper that the *Cassisi* inference does not apply as a matter of law, Defendants may make the appropriate motion. However, the Court finds Defendants' arguments on this point to be somewhat incongruous with their theory of the case. The gravamen of Defendants' defense is that it is impossible for the mosquito magnet to have caused the alleged injuries in this case. Defendants' arguments pertaining to the assertion that, because the McCool family did not properly maintain their mosquito magnet, summary judgment should be entered in Defendants' favor, is curious. If it is scientifically possible for the mosquito magnet to have caused the alleged injuries in this case (due to improper maintenance), then this strengthens the Court's conclusion that a jury should decide the propriety of the McCools' maintenance of the mosquito magnet.

machine was disassembled, transported, and reassembled during the official investigation into Mrs. McCool's death. There is evidence that the reassembly of the machine was incorrect.

In summary, Plaintiff did not neglect to attempt to investigate a defect in the mosquito magnet machine. Plaintiff attempted to do so, but the results were inconclusive. The manner in which Mrs. McCool died has had the result of placing a significant burden upon Plaintiff to rule out causes of death other than the mosquito magnet, much in the same way as the destroyed dryer in *Cassisi*. When the facts of this case are viewed in their entirety, the Court concludes that the *Cassisi* inference is more appropriately viewed as a shield in this case—shielding Plaintiff from disproving other potential causes of death—rather than a sword. One of the reasons *Cassisi* was adopted into law was because the true explanation for an accident (in appropriate cases) is more accessible to a defendant than to a plaintiff. *See Cassisi*, 396 So. 2d at 1149. Here, Defendants are in the better position to know whether, as a matter of science, the components of the mosquito magnet machine are capable of inflicting the alleged injuries in this case. To be clear, if Defendants are able to prove at trial that as a matter of science and logic it is impossible for the mosquito magnet to emit gases that could be responsible for the death of Mrs. McCool and the symptoms exhibited by Detective Broehm, the Court will entertain a motion for judgment as a matter of law. But this is not clear in the record before the Court and, when asked at oral argument for a citation to such evidence, the Court was informed that it was "impossible" for Defendants to produce. What the Court is presented with is evidence that the machine can emit dangerous gases, that an expert is prepared to testify the gases can be responsible for the unfortunate events in this case, and that Detective Broehm was tested at the scene to have an unusually high carbon monoxide reading in his blood (*after* being administered pure oxygen for

14

some time).[6]  To the extent Defendants argue Plaintiff's theory of the case is scientifically impossible and Defendants have clear and uncontroverted evidence of the same, the Court cannot conclusively locate that evidence in the thousands of pages filed into the court docket by Defendants on April 5, 2016.

### B. Plaintiff's Evidence of Causation

There is adequate evidence in the record to submit the issue of causation the jury.  There is sufficient evidence in the record to reasonably infer that Mrs. McCool came into close contact with the mosquito magnet in the same manner as Detective Broehm.  When that evidence is combined with the evidence of Detective Broehm's illness and is viewed in the light most favorable to Plaintiff, a question of material fact arises as to whether the mosquito magnet machine caused the death of Mrs. McCool by causing her, through a reaction to the gases emitted by the machine, to fall into the pool in the same manner in which Detective Broehm almost fell in the pool.  *See generally McCain v. Fla. Power Corp.*, 593 So. 2d 500, 504 (Fla. 1992) (noting that ordinarily the issue of causation is left to the fact-finder).

### IV. CONCLUSION

The facts of this case present a difficult question for the Court.  The mosquito magnet was made available to Plaintiff for testing.  Plaintiff's access to the machine notwithstanding, Plaintiff's experts have not proven that the machine emits excess carbon monoxide.  Furthermore, no witness observed what happened to Mrs. McCool.  There is no direct evidence she was exposed to mosquito magnet gas emissions in the same manner as Detective Broehm.

---

[6] Plaintiff also has an expert who is prepared to testify that gas emissions from the mosquito magnet are a reasonable explanation for both Detective Broehm's symptoms and Mrs. McCool's death. Additionally, Plaintiff has expert testimony to argue that Defendants' own theory of the cause of Mrs. McCool's death is less likely than Plaintiff's carbon monoxide theory, and may even be scientifically impossible.

As a result, this case is not a perfect fit with *Cassisi*.

The Court must weigh the disassembly of the mosquito magnet on the night of Mrs. McCool's death and the inconclusive testing results by Plaintiff's expert on the machine with the proposition that *Cassisi* is intended for when the circumstances of a malfunction are such that a defect may be inferred. Similarly, the Court must weigh the circumstantial evidence from which a jury could infer that Mrs. McCool suffered an injury resembling, or greater than, that of Detective Broehm.

*Cassisi* permits the Court to infer "that the malfunction itself, *under certain circumstances*, is evidence of a product's defective condition." *Cassisi*, 396 So. 2d at 1153 (emphasis added). After considering the highly unusual "certain circumstances" of this case, the Court ultimately resolves these questions in favor of Plaintiff. Detective Broehm's illness was severe. His illness was observed by other witnesses who confirm the severity of his symptoms. There is objective evidence in the form of an on-scene blood test to support the proposition that his illness was caused by the mosquito magnet. Plaintiff has expert witnesses who are prepared to testify and explain why subsequent evidence, which facially supports Defendants, does not contradict Plaintiff's theory of the case. There is evidence from which the jury could reasonably infer that Mrs. McCool interacted with the mosquito magnet machine as closely as Detective Broehm did shortly before her death. Plaintiff has a substantial basis on which to call into question Defendants' alternative theories of Mrs. McCool's cause of death. Viewing all facts in the record in the light most favorable to Plaintiff, this is enough. It is enough for Plaintiff to qualify for the *Cassisi* inference and submit the case to a jury.

One final matter remains. In their reply, Defendants assert that if the *Cassisi* inference

applies and Plaintiff's case is submitted to the jury by virtue of the *Cassisi* inference, Plaintiff may not maintain a negligent products liability claim, a defective design claim, nor a defective warning claim. At oral argument, Plaintiff appeared to concede this was true, if *Cassisi* applied, but Plaintiff's position was that the aforementioned causes of action could be maintained in the absence of a *Cassisi* inference as an in-the-alternative pleading. While the Court has determined that *Cassisi* applies, the Court has great concerns about whether other potential theories (besides the allegation of a product defect) can be maintained in the alternative and potentially submitted to the jury. Nonetheless, this particular issue was only developed in Defendants' reply and is, for present consideration, insufficiently briefed. The Court therefore defers this particular issue to trial and will reconsider it upon further briefing. It is therefore **ORDERED** that Defendants shall file a trial brief on this subject no later than May 19, 2016 at 5:00 pm and Plaintiff shall file a response no later than May 23, 2016 at 2:00 pm. It is further

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [DE 158] is **DENIED**.

**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 17th day of May, 2016.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record